UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No.15-cv-01188-EDL |
| Plaintiffs, | |
| | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RELATOR'S CLAIMS AND DENYING COUNTERCLAIMANTS' MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIMS** |
| v. | |
| ASSOCIATION OF BEHAVIOR CONSULTANTS, et al., | Re: Dkt. Nos. 99, 100 |
| Defendants. | |

Before the Court are two motions for summary judgment: (1) Defendants Association of Behavior Consultants' ("ABC") and William J. Palyo's ("Palyo" and together, "Defendants") motion for summary judgment on Relator Deborah Cullen's ("Relator") claims; and (2) Counterclaimants Association of Behavior Consultants' and William J. Palyo's ("Counterclaimants") motion for summary judgment on their counterclaims.[1]

For the reasons discussed below, the Court GRANTS Defendants' motion for summary judgment on Relator's claims and DENIES Counterclaimants' motion for summary judgment on the counterclaims. The parties are directed to contact Judge Hixson's chambers to schedule a further settlement conference before trial.

## I.      FACTUAL BACKGROUND

On March 12, 2015, Relator filed this qui tam action pursuant to 31 U.S.C. § 3730(b)(2)

---

[1] Although Defendants and Counterclaimants are the same parties, the Court will refer to them as Defendants and Counterclaimants when discussing the respective motions for summary judgment.

United States District Court
Northern District of California

United States District Court
Northern District of California

(the "Federal Complaint").  Dkt. No. 1; Malone Decl., Ex. A.[2]  The Federal Complaint raised the following claims: (1) knowingly submitting a false or fraudulent claim in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A); (2) knowingly creating or using a false record or statement material to a false or fraudulent claim in violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(B); (3) knowingly presenting a false claim for payment or approval in violation of the California False Claims Act ("CFCA"), Cal. Gov't Code § 12651(a)(1); (4) knowingly submitting a false record or statement to obtain a false payment or approval in violation of the CFCA, Cal. Gov't Code § 12651(a)(2); and (5) failure of the beneficiary of a false claim to disclose the false claim within a reasonable time after discovery in violation of Cal. Gov't Code § 12651(a)(8).

Relator's Federal Complaint[3] alleges that she is a behavioral support specialist who does hands-on work with disabled children.  Fed. Compl., ¶ 4.  From May 1999 through February 2014, she alleges that she was employed by ABC, which is owned by Palyo, as a behavioral support specialist and worked with special needs children in Marin, Napa, and Sonoma Counties in California through the North Bay Regional Center, the Novato Unified School District, the Sebastopol School District, the Santa Rosa City School District, the Sonoma County Office of Education, Rincon Valley School District, and the early preschool intervention programs, Redwood Consortium Preschool Program.  Id., ¶¶ 4, 6.  She alleges that ABC fired her after she discovered that ABC was fraudulently billing hours and expenses and she refused to participate.  Id., ¶ 4.

Relator further alleges that ABC is a "fee for service" company that acquires contracts through parents, insurance services, the Regional Centers, and other sources, and that almost all of

---

[2] Counterclaimants request judicial notice of the Federal Complaint, the answer and counterclaim to the Federal Complaint, the State Complaint, dismissal of the State Complaint, unsealing order for the Federal Complaint, United States' declination in this case, State of California's declination in this case, and Counterclaimants' brief in support of their motion for summary judgment on the counterclaims.  It is not necessary to take judicial notice of documents filed in this case, but the Court takes judicial notice of the documents filed in the state case only for the fact that they were filed, not for the truth of their contents.

[3] The parties did not provide adequate evidence in the motions to supply a factual summary of the case, so the Court summarizes the factual allegations in Relator's complaint.

United States District Court
Northern District of California

1  the families receiving its services are federal Supplemental Security Income and MediCal

2  recipients.  Id., ¶ 8.  Relator alleges that ABC's services, depending on the contract, are billed

3  through the Regional Center, County Offices of Education, privately, and medical insurance, and

4  that ABC overbilled for these contracts.  Id.  Specifically, Relator alleges that ABC and Palyo

5  knowingly "over-billed, padded hours, billed excessive mileage, billed for mileage not driven, and

6  charged for phantom services through: individual client contracts, client respite services, group

7  services for clients, and respite services."  Id., ¶ 12.

8        On March 12, 2015, several days after filing her Federal Complaint, Relator filed a

9  separate complaint against Counterclaimants in the Superior Court of California, County of

10  Sonoma, Case No. SCV-256863.  Malone Decl., Ex. B ("State Complaint").  The State Complaint

11  alleged: (1) wrongful termination in violation of public policy; (2) whistleblower retaliation in

12  violation of Cal. Lab. Code § 1102.5; (3) whistleblower retaliation in violation of Cal. Gov't Code

13  § 12653; and (4) failure to pay wages owed in violation of California Lab. Code §§ 201 and 203.

14  The State Complaint alleges that ABC never paid overtime due to Relator or reimbursed her for

15  mileage.  State Compl., ¶ 10.  She also alleged that ABC billed for the mileage for which she was

16  not reimbursed and knowingly over-submitted Relator's hours, double charged for reports and

17  payments, and billed for hours of supervision that were not performed.  Id., ¶ 10.  She alleged that

18  some of her colleagues would routinely work 10 hours but charge for 20 hours because they felt

19  their low pay justified that conduct, which resulted in fraud against Social Security, MediCal,

20  Section 8, and state funds.  Id., ¶ 11.  Relator alleges that she confronted management about these

21  alleged fraudulent billing practices, and that she was fired for her refusal to comply with

22  instructions to falsify her hours.  Id., ¶¶ 12, 14.

23        On or about March 4, 2016, the parties entered into a settlement agreement that partially

24  resolved Relator's State Complaint (the "First Settlement Agreement").  Malone Decl., Ex. D.

25  The First Settlement Agreement settled Relator's failure to pay wages claim.  Id.

26        On September 14, 2016, the parties entered into a second settlement that fully settled the

27  remaining disputes that gave rise to the State Complaint (the "Second Settlement Agreement").

28  Id., Ex. C.  The Second Settlement Agreement contained a full release of claims Relator had or

would have in the future against Counterclaimants that "in any way gr[ew] out of events . . . identified in [the State Complaint]." Id., § 1.1.  Relator "expressly waive[d] all rights she has, or may have, under Section 1542 of the Civil Code of California . . . " Id., § 1.5.  The Second Settlement Agreement expressly applied to "any individual and/or representative claims of whistleblower retaliation pursuant to the Federal False Claims Act (31 U.S.C. §§ [sic] 3730(h) and the California False Claims Act (Cal. Gov't Code § 12653)." Id., § 1.6.  The release did "not extend to any claim or action, known or unknown, by the United States or the State of California, or to any reward paid by the United States or the State of California, pursuant to the Federal False Claims Act (31 U.S.C. §§ 3729 et seq.), the California False Claims Act (Cal. Gov't Code §§ [sic] 12650), or any other federal or state statute or regulation whereby a government entity claims entitlement to recover funds and pays to anyone a reward for such recovery." Id.  The Second Settlement Agreement contained an indemnification provision whereby

> Plaintiff agrees to defend, indemnify, protect and hold the released parties harmless from any and all liens, rights of subrogation, indemnification claims, contribution claims, defense claims, losses, liability, actions, damages, causes of action, judgments, costs and expenses, including attorney's fees, whatsoever made by or sustained by or arising from any person, corporation, partnership, state or federal government, governmental agency, hospital, or any other medical provider, health care provider, disability or insurance benefits provider, workers compensation carrier, Medicare, Medicaid, Medi-Cal or any other entity arising in whole or in part out of the incident(s), or in any way connected to the allegations in this action.

Id., § 4.3.  After the parties entered into the Second Settlement Agreement, Relator requested dismissal with prejudice of the state court case, which the clerk of court entered on November 7, 2016.  Malone Decl., Ex. E.

## II.    PROCEDURAL HISTORY

As noted above, Relator filed her complaint in this Court on March 12, 2015.  On February 5, 2016, the United States of America declined to intervene, and on August 5, 2016, the State of California also declined to intervene.  The Court lifted the seal on December 7, 2016 and ordered Relator to serve the complaint on Defendants.  On March 3, 2017, Defendants answered the complaint and asserted the following counterclaims against Relator: (1) breach of contract; (2)

1    express indemnity; (3) implied indemnity; (4) contribution; and (5) a request for declaratory relief.

2         On March 23, 2017, Relator moved to strike Defendants' counterclaim under California's

3    anti-SLAPP statute.  On May 18, 2017, the Court denied Relator's motion to strike Defendants'

4    counterclaim.  On June 13, 2017 and June 16, 2017, respectively, Relator filed a motion for relief

5    from the order denying Relator's motion to strike Defendants' counterclaim and a motion to

6    dismiss Defendants' counterclaim.  The Court denied both motions in an order dated September 1,

7    2017.

8         Relator also moved for Rule 11 sanctions against Defendants on the grounds that their

9    counterclaims are frivolous.  The Court denied that motion on September 11, 2017.

10   **III.     LEGAL STANDARD**

11        Summary judgment shall be granted if "the pleadings, discovery and disclosure materials

12   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

13   movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are

14   those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

15   242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

16   reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in

17   the light most favorable to the non-moving party and give it the benefit of all reasonable

18   inferences to be drawn from those facts.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

19   475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the

20   matter, but only determine whether there is a genuine issue for trial.  See Balint v. Carson City,

21   180 F.3d 1047, 1054 (9th Cir. 1999).

22        A party seeking summary judgment bears the initial burden of informing the court of the

23   basis for its motion, and of identifying those portions of the pleadings and discovery responses

24   that demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477

25   U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must

26   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

27   party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving

28   party can prevail merely by pointing out to the district court that there is an absence of evidence to

United States District Court
Northern District of California

support the nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

## IV.    DISCUSSION

### A.    Defendants' Motion for Summary Judgment on Relator's Claims

Defendants' motion for summary judgment on Relators' claims contains numerous arguments, some of which challenge the pleading itself, some contend that Relator does not have sufficient evidence to raise a triable issue of fact, and some of which recycle arguments that they raised in their motion for summary judgment on their counterclaims.  The Court addresses each argument in turn.

#### 1.    Complaint's Compliance with Rule 9(b)

Defendants argue that the Court should dismiss the Federal Complaint because it fails to allege fraud with particularity as required by Federal Rule of Civil Procedure 9(b).  As noted above, Relator filed the Federal Complaint on March 12, 2015 and the Court unsealed it on December 7, 2016.  Defendants were promptly served with the Federal Complaint and chose to answer it on March 3, 2017 and file their counterclaim.  At no time in the last two years have Defendants challenged the sufficiency of the allegations in the Federal Complaint.

The time for Rule 12(b)(6) motions has long passed.  See Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed.").  Under different circumstances, it would be possible to convert Defendants' motion to a Rule 12(c) motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised . . . by a motion under Rule 12(c) . . . "); Fed. R. Civ. P. 12(c) ("After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings.").  The Court recently vacated the trial date to give Relator sufficient time to oppose Defendants' motions for summary judgment in order to accommodate her counsel's trial schedule in another case, but the Court has since rescheduled trial

6

United States District Court
Northern District of California

1    for October 2019.  This is a four-year old case, discovery has closed, and a trial date is in place.

2    Defendants sat on this challenge until the last possible moment, thereby prejudicing the orderly

3    resolution of this case.  The Court will not entertain Defendants' last-minute objection to the

4    sufficiency of the pleadings.

5                    **2.        Requirement for Government Disclosure**

6            Defendants further contend that the entire Federal Complaint should be dismissed because

7    Relator failed to disclose her allegations to the United States government before filing.  The FCA

8    provides that "[a] copy of the complaint and written disclosure of substantially all material

9    evidence and information the person possesses shall be served on the Government pursuant to

10   Rule 4(d)(4) of the Federal Rules of Civil Procedure."  31 U.S.C. § 3730(b)(2).  Defendants

11   contend that Section 3730(b)(2) required Relator to provide all material information about her

12   claims to the government before filing her complaint.  They cite the portion of Relator's

13   deposition in which she confirmed that she contacted the United States after she filed the Federal

14   Complaint.  Ex. J, 266:1-5, 267:17-19.

15          The plain language of § 3730(b)(2) does not impose a pre-filing disclosure requirement on

16   Realtor and Defendants have not cited any authority for that proposition.  Accordingly, the Court

17   denies summary judgment on this basis.

18                  **3.        Public Disclosure of Relator's FCA and CFCA Claims**

19          Defendants also argue that Relator's FCA and CFCA claims are barred because she

20   publicly disclosed her allegations through the State Complaint before filing the Federal Complaint.

21   Both the FCA and CFCA include provisions that only permit the relator to maintain a civil suit if

22   the relator brings suit for purported fraud that has not already been exposed.  The FCA provides

23   that:

24                  The court shall dismiss an action or claim under this section, unless
                    opposed by the Government, if substantially the same allegations or
25                  transactions as alleged in the action or claim were publicly
                    disclosed—
26                        (i) in a Federal criminal, civil, or administrative hearing in
                         which the Government or its agent is a party;
27                       (ii) in a congressional, Government2 Accountability Office,
                         or other Federal report, hearing, audit, or investigation; or
28                       (iii) from the news media,

                                                    7

1

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

2

31 U.S.C. § 3730(e)(4)(A).  "Original source" "means an individual who either (i) prior to a public

3

disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information

4

on which allegations or transactions in a claim are based, or (2) who has knowledge that is

5

independent of and materially adds to the publicly disclosed allegations or transactions, and who

6

has voluntarily provided the information to the Government before filing an action under this

7

section." Id., § 3730(e)(4)(B).

8

The CFCA's public disclosure provisions are almost identical.  It provides:

9
10
11

> The court shall dismiss an action or claim under this section, unless opposed by the Attorney General or prosecuting authority of a political subdivision, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed in any of the following:

12
13
14

> > (i) A criminal, civil, or administrative hearing in which the state or prosecuting authority of a political subdivision or their agents are a party.
> > (ii) A report, hearing, audit, or investigation of the Legislature, the state, or governing body of a political subdivision.
> > (iii) The news media.

15
16

Cal. Gov't Code § 12652(d)(3)(A).  These provisions do not apply if "the action is brought by the

17

Attorney General or prosecuting authority of a political subdivision, or the person bringing the

18

action is an original source of the information." Id., § 12652(d)(3)(B).  "Original source" is

defined as "an individual who either:"

19
20
21
22
23

> > (i) Prior to a public disclosure under subparagraph (A), has voluntarily disclosed to the state or political subdivision the information on which allegations or transactions in a claim are based.
> > (ii) Has knowledge that is independent of, and materially adds to, the publicly disclosed allegations or transactions, and has voluntarily provided the information to the state or political subdivision before filing an action under this section.

Id., § 12652(d)(3)(C).

24
25

Both statutes require a two-step analysis.  First, the Court must determine if public

26

disclosure had been made before the relator filed the qui tam suit.  Then, if there has been a pre-

27

filing public disclosure, the Court must consider whether the relator is an original source.

28

Defendants' entire argument hangs on their misapprehension that Relator filed the State

8

Complaint, which made some reference to Defendants' alleged fraud, before filing the Federal Complaint. A quick review of the filing dates of each complaint resolves this issue in favor of Relator. Relator filed the Federal Complaint on March 12, 2015. Dkt. No. 1. Relator then filed her State Complaint four days later on March 16, 2015. Malone Decl., ¶ 2, Ex. B.

### 4. Res Judicata

Defendants also seek a judicial determination that the claims in Relator's Federal Complaint are barred by the doctrine of res judicata. Res judicata "describes the preclusive effect of a final judgment on the merits." Allied Fire Protection v. Diede Constr., Inc., 127 Cal. App. 4th 150, 154 (Cal. Ct. App. 2005) (quoting Mycogen Corp. v. Monsanto Co., 28 Cal. 4th 888, 897 (2002)). Res judicata is also known as claim preclusion and "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." Id. It requires that "all claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date." Id. The doctrine only applies when (1) the final judgment in the prior proceeding is on the merits; (2) the prior proceeding involves the same cause of action (defined as "the obligation sought to be enforced") as the present proceeding; and (3) the prior proceeding was between the same parties or their privies. Busick v. Workmen's Comp. Appeals Bd., 7 Cal. 3d 967, 974-75 (1972) (quoting Panos v. Great Western Packing Co., 21 Cal. 2d 636, 638 (1943)). Res judicata applies to "matters which were raised or could have been raised, on matters litigated or litigable." Busick, 7 Cal. 3d at 975 (quoting Sutphin v. Speik, 15 Cal. 2d 195, 202 (1940)).

California's doctrine of res judicata "is based upon the primary right theory." Mycogen Corp. v. Monsanto Co., 28 Cal. 4th 888, 904 (2002). The California Supreme Court has explained that:

> The primary right theory is a theory of code pleading that has long been followed in California. It provides that a "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty. The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action . . .
>
> As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. It must

9

therefore be distinguished from the legal theory on which liability for that injury is premised: "Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief."  The primary right must also be distinguished from the remedy sought: "The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other."

The primary right theory . . . is invoked . . . when a plaintiff attempts to divide a primary right and enforce it in two suits. The theory prevents this result by either of two means: (1) if the first suit is still pending when the second is filed, the defendant in the second suit may plead that fact in abatement;  or (2) if the first suit has terminated in a judgment on the merits adverse to the plaintiff, the defendant in the second suit may set up that judgment as a bar under the principles of res judicata.

Id. (quoting Crowley v. Katleman, 8 Cal. 4th 666, 681-82 (1994) (internal citations and quotations omitted)).

Defendants argue that the First and Second Settlement Agreements and Relator's dismissal with prejudice of the State Complaint operate as bars to Relator's claims in the Federal Complaint.[4]  If Relator's Federal Complaint falls within the same cause of action, according to California's primary right theory, then the dismissal with prejudice in the state case would have preclusive effect here.  See Alpha Mechanical, Health & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of Am., 133 Cal. App. 4th 1319, 1331-32 (Cal. Ct. App. 2005); Torrey Pines Bank v. Sup. Ct., 216 Cal. App. 3d 813, 820 (Cal. Ct. App. 1989).  As the court in Torrey Pines reasoned, and the Alpha court followed, "a retraxit – modernly effected by a plaintiff's filing of a dismissal of his or her action with prejudice – is deemed to be a judgment on the merits against that plaintiff."  Torrey Pines, 216 Cal. App. 3d at 820; Alpha Mechanical, 133 Cal. App. 4th at 1330.  Thus, the first element of res judicata – a final judgment on the merits – is fulfilled.

The second requirement is that the two cases involve the same cause of action.  Defendants summarily argue that the primary right at issue in both cases is the false claims act lawsuit, which

---

[4] In their statement of law, Counterclaimants cite Wade v. Ports Am. Mgmt. Corp., 218 Cal. App. 4th 648 (Cal. Ct. App. 2013) in support of the proposition that "[a] prior release and settlement is res judicata on matters which were raised, or could have been raised, on matters litigated or litigable."  Wade, however, held that a labor arbitration – not a settlement – could have preclusive effect on nonstatutory employment discrimination claims.  Id. at 655-56.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    relates directly to the alleged losses that were already compensated in the state court case.

2    Relator's State Complaint raised whistleblower retaliation claims, wrongful termination, and

3    unpaid wage claims that allegedly harmed her personally.  The Federal Complaint alleges qui tam

4    claims under the Federal and California false claims act statutes.  She acts as a relator with respect

5    to the false claims act claims on behalf of the United States and California, whereas her

6    whistleblower retaliation claims, wrongful termination, and unpaid wage claims are personal to

7    her.

8         In support of their primary right argument, Defendants rely on Villacres v. ABM Indus.

9    Inc., 189 Cal. App. 4th 562 (Cal. Ct. App. 2010).  In Villacres, the plaintiff had been a member of

10   a class action in a prior lawsuit alleging Labor Code violations against his employer.  Id. at 573.

11   After a settlement in the prior lawsuit released his employer of "any and all claims" that could

12   have been asserted against it arising out of the same conduct, the plaintiff initiated a second

13   lawsuit raising a Private Attorney General Action ("PAGA").  Id. at 572-73.  The court granted the

14   employer's motion for summary judgment on the PAGA claim based on res judicata, which the

15   appellate court affirmed.  Id. at 574.  The appellate court reasoned that the plaintiff did not object

16   to the settlement of the prior action, seek to intervene to preserve the PAGA claims, or opt out of

17   the class to pursue the PAGA claim, so that it was precluded by the settlement.  Id. at 581-82.

18        Villacres is distinguishable.  A PAGA claim can be brought "by an aggrieved employee on

19   behalf of himself or herself and other current or former employees."  Cal. Lab. Code § 2699(a).

20   Through a PAGA claim, an aggrieved employee may recover civil penalties, 75% of which must

21   be distributed to the Labor and Workforce Development Agency and 25% of which must be

22   distributed to the aggrieved employees.  Id. § 2699(i).  With respect to a FCA civil claim, "[a]

23   person may bring a civil action for a violation of [the False Claims Act] for the person and for the

24   United States," but "[t]he action shall be brought in the name of the Government."  31 U.S.C. §

25   3730(b).  The person who brings the lawsuit – called a relator – receives an "award" that is a

26   percentage of the civil penalty and damages collected, the amount of which depends on the

27   circumstances of how the case proceeds.  Id. § 3730(d).  Although the relator may obtain an

28   award, the statute provides that the defendant "is liable to the United States" for the civil penalty

and damages.  31 U.S.C. § 3729(a)(1).  The CFCA has a similar structure.  See Cal. Gov't Code §

12651(a) ("Any person who violates [the statute] . . . shall be liable to the state or to the political

subdivision" for damages, a civil penalty, and costs); Cal. Gov't Code § 12651(c)(1) ("A person

may bring a civil action for a violation of this article for the person and either for the State of

California in the name of the state, if any state funds are involved, or for a political subdivision in

the name of the political subdivision, if political subdivision funds are exclusively involved.").

This distinction between a PAGA claim and a qui tam false claims act claim may be subtle,

but it is significant here.  The PAGA statute recognizes that the injuries caused by the underlying

Labor Code violations harm the aggrieved employee who shares in the civil penalty for that

reason.  PAGA "'empowers or deputizes an aggrieved employee to sue for civil penalties . . . as an

alternative to enforcement by the [State]'" and is "a powerful tool for aggrieved employees."

Villacres, 189 Cal. App. 4th at 592 (emphasis and internal quotations omitted).  The false claims

statutes, however, explicitly state that the liability for violating the statutes runs to the government

entity and that the "award" is given to the relator solely as a bounty for bringing the case in the

name of the government entity.  The liability for violation of the false claims statutes focuses on

an injury that is separate and apart from the whistleblower retaliation injury that Relator sought

recovery for in the state court action.  In this way, Relator's two complaints are distinguishable

from Rangel v. PLS Check Cashers of California, Inc., 899 F.3d 1106 (9th Cir. 2018), another

case relied on by Defendants, which held that a class settlement of state wage-and-hour and unfair

competition law claims had preclusive effect on a lawsuit raising claims under the Fair Labor

Standard Act ("FLSA") brought by a member of the settlement class and arising from the same

underlying conduct and harm to the employees.  Id. at 1111-12 ("[The plaintiff's] FLSA claims, as

federal versions of the state law claims asserted in the [settled] action, are typical examples of

claims invoking 'the same injury to the same right' litigated in a prior case.").

Finally, Defendants give short shrift to the third element of the res judicata doctrine, which

requires that the judgment in the prior proceeding involves the same parties or their privies as the

current proceeding.  They argue that this requirement is satisfied because they "are Defendants in

each case and, as such, there is privity."  Mot. at 19.  This contention ignores the fact that Relator

asserts the claims in this case as an emissary of the United States and the State of California.  As

discussed above, Relator was required to file this lawsuit in the name of those entities, even

though she has some interest in the claims because of the award she is entitled to under the

statutes.  See U.S. ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1167 (10th Cir. 2009)

(recognizing that "the relator has an interest in some part of the civil action apart from the

government" and that the Supreme Court has stated that "qui tam relators under the [False Claims

Act] possess an interest akin to a 'partial assignment of the Government's damages claim'")

(quoting Vt. Agency of Nat. Res. V. U.S. ex rel. Stevens, 529 U.S. 765, 773 (2000)).

Only in their reply brief do Defendants address the privity issue.  They argue that Relator

has an unduly narrow view of the term "privity" and that for res judicata purposes, "privity

requires the sharing of 'an identity or community of interest,' with 'adequate representation' of

that interest in the first suit, and circumstances such that the nonparty 'should reasonably have

expected to be bound' by the first suit."  Castillo v. Glenair, Inc., 23 Cal. App. 5th 262, 277 (Cal.

Ct. App. 2018) (quoting DKN Holdings LLC v. Faerber, 61 Cal. 4th 813, 826 (2015)).  In other

words, "[a] nonparty alleged to be in privity must have an interest so similar to the party's interest

that the party acted as the nonparty's 'virtual representative' in the first action."  Id.  Defendants'

argument that Relator and the governments were in privity for purposes of the State Complaint is

even more tenuous than the argument that she is asserting the same primary right in each case.

Relator's claims in the state case were all personal to her.  Although California may have an

indirect interest in seeing that Relator's rights to being free of retaliation and receiving full

payment of her wages are vindicated, Relator and the governments cannot be said to have a

virtually identical interest in those claims.

For these reasons, res judicata does not preclude the qui tam claims in this case.

### 5. First-to-File Rule

Defendants also move for summary judgment on the grounds that the so-called "first-to-

file" rule bars Relator's participation in this case.  The first-to-file rule "prevent[s] successive

plaintiffs from bringing related actions on the same underlying facts."  U.S. ex rel. Lujan v.

Hughes Aircraft Co., 243 F.3d 1181, 1187 (9th Cir. 2001).  The rule is based on the language of

1    Section 3730(b)(5) of the False Claims Act, which provides that "[w]hen a person brings [a qui

2    tam action], no person other than the Government may intervene or bring a related action based on

3    the facts underlying the pending action."  It acts by "preclude[ing] a subsequent relator's claim

4    that alleges the defendant engaged in the same type of wrongdoing as that claimed in a prior action

5    even if the allegations cover a different time period or location within a company." Id. (quoting

6    United States ex. Rel. Capella v. United Techs. Corp., 1999 WL 464536, at *9 (D. Conn. June 3,

7    1999)).

8         Defendants argue that the first-file-rule bars this case because Relator is attempting to re-

9    litigate "identical claims previously asserted and resolved in the Sonoma County (State) lawsuit."

10   Mot. at 17.  There is no basis for this argument.  Plainly, Relator's State Complaint raised

11   wrongful termination, retaliation, and unpaid wage claims.  While the allegations that underlie the

12   FCA and CFCA claims necessarily undergird the state claims as well, they are distinct.  Moreover,

13   the Federal Complaint, which alleges the qui tam claims, *was* the first-filed complaint.

14        **6.    False Claims Act Liability**

15        Finally, Defendants move for summary judgment on Relator's FCA and CFCA claims on

16   the grounds that there is no triable issue of fact.  Under the FCA a person is liable if he

17   "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

18   approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement

19   material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).  A "claim" includes direct

20   requests for government payment as well as reimbursement requests made to the recipients of

21   federal funds under a federal benefits program. 31 U.S.C. § 3729(b)(2)(A); Universal Health

22   Servs., Inc. v. United States (Escobar), __ U.S. __, 136 S. Ct. 1989, 1996 (2016).  A claim under

23   the FCA requires a showing of "(1) a false statement or fraudulent course of conduct, (2) made

24   with the scienter, (3) that was material, causing (4) the government to pay out money or forfeit

25   moneys due." United States ex rel. Hendow v. Univ. of Phx., 461 F.3d 1166, 1174 (9th Cir.

26   2006).  The elements of a CFCA claim are the same.  See Hooper v. Lockheed Martin Corp., 688

27   F.3d 1037, 1047 (9th Cir. 2012).

28        In support of their motion for summary judgment, Defendants rely entirely on Relator's

United States District Court
Northern District of California

14

deposition testimony in which Relator could not provide any examples of specific instances of a false claim that was supposedly submitted for approval or payment to a government entity.  She was asked specifically if she could provide "a specific example that you have come across where a false or fraudulent claim for approval or payment for Medi-Cal has been provided by Mr. Paylo or ABC."  Malone Decl., ¶ 10, Ex. J, 342:9-12.  Relator responded: "I haven't seen a direct document. Again – but again, a good portion of the kids on my caseload receive Medi-Cal and Social Security funding."  Id., 342:13-15.  As follow up, Defendants asked her if "it would be fair to say as phrased, you do not have an answer to the question?," to which Relator responded, "Yeah, I would say that's fair enough."  Id., 342:16-18.  Regarding the second FCA claim for the making or use of a false record, Defendants submitted the same evidence.  On reply, Defendants point out that in her deposition Relator admitted that she did not have any personal knowledge about the amounts that were actually billed to or paid by the government entities to ABC.  Ex. J, 299:11-18, 316:17-22-317:1, 328:15-23, 352:9-21, 357:3-9, 366:24-367:2, 370:7-23.  However, Relator's deposition answers were based on her personal knowledge of her case notes and other case-related and timekeeping materials, as she had not yet obtained discovery from Defendants.  Cullen Decl., ¶ 21.  She was deposed in January 2018, but ABC did not produce documents until October 2018.  Id.

Relator's opposition failed to address Defendants' request for summary judgment on the qui tam claims, but in her statement of facts in her opposition she states that the declaration she filed with her opposition "details specific instances of billing fraud, significantly expanding on the 'who, what, when, where, and how' of [Defendants'] fraud."  Opp. at 4.  Relator's declaration referenced several exhibits, although not all of the referenced exhibits were filed on the docket with the declaration.  Relator also filed four declarations from "mothers of children to whom Relator provided behavioral services while she was at ABC."  Opp. at 5 (noting the declarations of Audrey Cade, Stacie Erickson, Monique Starr-Montes, and Christine Strasser).  She claims that these four declarations "show how [Relator] learned firsthand about the billing fraud by ABC and its management, and reflect the pattern of retaliation that ABC and its management brought against [Relator]."  Opp. at 5.

1    Defendants object to Relator's declaration and the attached exhibits on numerous grounds,

2  including that Relator lacked personal knowledge or foundation or that Relator had not properly

3  authenticated the exhibits.  Aside from the issue with the documents that were inadvertently

4  missing from the declaration, the most obvious deficiency with the declaration evidence that

5  Relator originally submitted with her opposition is that most of the exhibits were unauthenticated.

6  As the Ninth Circuit explained in <u>Orr v. Bank of Am., NT & SA</u>, 285 F.3d 764 (9th Cir. 2002):

> A trial court can only consider admissible evidence in ruling on a
> motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Beyene v.</u>
> <u>Coleman Sec. Servs., Inc.</u>, 854 F.2d 1179, 1181 (9th Cir. 1988).
> Authentication is a "condition precedent to admissibility," and this
> condition is satisfied by "evidence sufficient to support a finding that
> the matter in question is what its proponent claims."7 Fed. R. Evid.
> 901(a). We have repeatedly held that unauthenticated documents
> cannot be considered in a motion for summary judgment.  <u>See</u>
> <u>Cristobal v. Siegel</u>, 26 F.3d 1488, 1494 (9th Cir. 1994); <u>Hal Roach</u>
> <u>Studios, Inc. v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542, 1550-51
> (9th Cir. 1989); <u>Beyene</u>, 854 F.2d at 1182; <u>Canada v. Blain's</u>
> <u>Helicopters, Inc.</u>, 831 F.2d 920, 925 (9th Cir. 1987); <u>Hamilton v.</u>
> <u>Keystone Tankship Corp.</u>, 539 F.2d 684, 686 (9th Cir. 1976).
> In a summary judgment motion, documents authenticated through
> personal knowledge must be "attached to an affidavit that meets the
> requirements of [Fed. R. Civ. P. 56(c)(4)] and the affiant must be a
> person through whom the exhibits could be admitted into evidence."
> <u>Canada</u>, 831 F.2d at 925 (citation omitted). However, a proper
> foundation need not be established through personal knowledge but
> can rest on any manner permitted by Federal Rule of Evidence 901(b)
> or 902.  <u>See</u> Fed. R. Evid. 901(b)(providing ten approaches to
> authentication); Fed. R. Evid. 902 (self-authenticating documents
> need no extrinsic foundation).

19  <u>Id.</u> at 773-74.  "A document can be authenticated under [Rule 901(b)(1) based on personal

20  knowledge] by a witness who wrote it, signed it, used it, or saw others do so."  <u>Id.</u> at 773 n.8

21  (quoting 31 Wright & Gold, *Federal Practice & Procedure: Evidence* § 7106, 43 (2000)).  Rule

22  56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be

23  made on personal knowledge, set out facts that would be admissible in evidence, and show that the

24  affiant or declaration is competent to testify on the matters stated."  Fed. R. Evid. 56(c)(4).

25    The only documents attached to Relator's original declaration that were properly

26  authenticated were Exhibits E1-E2, which are time records she prepared, and Exhibits H1-H2,

27  which is a summary chart Relator put together of purported overcharges for two of her clients.

28  Since Relator prepared them she can authenticate them, although it is not apparent how Relator

1    can overcome other objections, such as hearsay, and she has failed to explain the foundation for

2    the summary contained in Exhibits H1-H2 beyond a statement that she "cross-referenced [her]

3    notes with dates ABC charged for Supervision, Behavioral Specialists, and Behavioral

4    Instructors."  Cullen Decl., ¶ 33, Ex. H1.

5        As a result of this fundamental problem with most of Relator's evidence for opposing

6    summary judgment, the Court gave Relator an opportunity to file a supplemental brief that

7    attempted to authenticate her evidence.  In response, Relator filed a revised declaration.  This

8    declaration provided additional information about the content of the documents, explained where

9    Relator obtained the documents, and attached the missing exhibits.  Despite this new information,

10   Relator's attempt to authenticate her documentary evidence was not entirely successful.  Relator

11   authenticated Exhibits A1-A4, which are documents related to ABC employees' credentials or

12   alleged lack thereof, when she states that these documents were "[p]roduced by NBRC at the

13   deposition of Liz Calder, North Bay Regional Center ("NBRC") PMK, in response to document

14   request" and that she "recognized them as consistent with what [she] had seen during her

15   employment at ABC."  Cullen Rev. Decl. at 11 ("Sources and Authentication of Exhibits").  This

16   information is sufficient to authenticate the documents at A1-A4 based on Relator's personal

17   knowledge that the documents are what they purport to be.  The same is true of Exhibits C1-C2,

18   which Relator personally obtained from the National Provider Registry and the Florida Behavior

19   Analyst website.

20       For the remaining documents, Relator attempts to authenticate them by indicating that they

21   were produced by NBRC or Defendants.  A document can be authenticated if it is produced by a

22   party in discovery.  See Orr, 285 at 777 n.20 (citing Maljack Prods., Inc. v. GoodTimes Home

23   Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996) (documents produced by a party in discovery

24   were deemed authentic when offered by the party-opponent); Snyder v. Whittaker Corp., 839 F.2d

25   1085, 1089 (5th Cir. 1988) (same); 31 Federal Practice & Procedure: Evidence § 7105 at 39

26   ("Authentication can also be accomplished through judicial admissions such as . . . production of

27   items in response to . . . [a] discovery request.").  The only exhibits attached to Relator's revised

28   declaration that were produced by Defendants are Exhibits B1-B4, which are parental verifications

United States District Court
Northern District of California

17

of time records for ABC employees, and Exhibits G1-G5, which are billing records associated with work done by ABC employee Paul Knaus.  Aside from a conclusory objection that Relator has not authenticated the documents, Defendants do not specifically object that these documents that they produced to Relator are inauthentic in any way.  Thus, the only authenticated documentary evidence the Court can consider is Exhibits A1-A4, B1-B4, C1-C2, E1-E2, G1-G5, and H1-H2.

Yet even if the Court considers this universe of documents, along with other information provided in Relator's declaration, Relator has failed to carry her burden to raise a triable issue of fact on each element of her FCA and CFCA claims.  Not all of the evidence Relator points to as demonstrating fraudulent conduct supports wrongdoing.  Moreover and just as crucially, Relator lacks any competent evidence that Defendants billed a government entity, that any false statements were material, that any false statements caused a payment to Defendants, or that Defendants received any payments.

In her declaration, Relator states that Defendants made false representations about the credentials of ABC employees – specifically, Michael Dyer, Alyssa Panza-Clark, Lou Sander, and Michael Tonjum – to obtain payment from North Bay Regional Center ("NBRC") and that these individuals did not have the proper Behavior Analyst Certification Board ("BACB") license to administrate, supervise, or implement programs as represented in the report.  Cullen Decl., ¶ 22.  On the issue of a purported lack of credentials, Relator focuses on Michael Dyer.  She contends that he has been using a fraudulent certification obtained from Florida with certification number 1-08-4738.  See Exs. B1-B4 ("Parental Verification for Receipt of Behavioral Services" showing services provided by Michael Dyer on behalf of ABC).  Relator states that Exhibit C2 shows that Mr. Dyer's Florida license has been inactive since 2003, but that exhibit only states that "[i]n October 2003, the BACB assumed all credentialing responsibilities for former certificants of the Florida Behavior Analysis Certification Program under the Florida Department of Children and Families."  Ex. C2.  Exhibit C2 does not adequately support Relator's claim that Mr. Dyer was licensed to provide the services he provided on behalf of ABC.  Instead, it merely states that the BACB is now responsible for licensing activities, and Relator has not demonstrated that Mr. Dyer

1    is not licensed through the BACB or was not during the relevant period.[5]

2          Relator also states in her declaration that ABC represents that its "[s]pecialists possess a

3    Master's or PhD degree in Behavior Analysis, Educational Psychology, Education, Special

4    Education, Counseling, or a related field with graduate course credit in Developmental

5    Disabilities."  Cullen Decl., ¶ 26.  Relator declares that Ms. Clark represented in her resume that

6    she has a Master's degree and that ABC represented that she had a MFT license, but that Ms.

7    Clark actually supervised Relator's work since 2011 "without the represented credentialing."  Id.

8    Relator did not attach any documentation to establish that Ms. Clark lacked a Master's degree or

9    an MFT license and Relator does not explain how she has personal knowledge that Ms. Clark

10   lacks these credentials.  Relator also states that Exhibits A1-A4 reflect that Defendants billed the

11   NBRC for services rendered by individuals who were not actively employed by ABC.  Id., ¶ 23.

12   In her declaration, Relator refers specifically to a Regina Granados, Ph.D., who she states was not

13   on ABC's staff.  Id., ¶ 27.  Relator also contends that ABC did not actually use the services of Dr.

14   Granados, Michael Tonjum, or Louis Sandler during her time as an ABC employee.  Id.  Relator

15   has not established that she has adequate personal knowledge to make this information admissible.

16   Moreover, Relator has not provided any evidence that the purported misrepresentations in the

17   Program Design about ABC's employees' credentials were material to the NBRC or caused the

18   NBRC to make payments to Defendants, which are both elements of an FCA claim.  While

19   misrepresenting the staff members' credentials might have been material to NBRC, Relator has

20   not provided evidence to show that she has proof of materiality or causation.  For example, she

21   could have deposed an NBRC designate about these claims and obtained testimony that it would

22   not have paid claims but for these misrepresentations, but she has not done so and, in fact,

23   according to Defendants, Relator did not depose anyone during discovery in this case.

24

25   [5] Defendants provide a screenshot of the BACB's website that shows a BACB certification for a
     Michael Dyer's who is located in Santa Rosa, California.  RJN, Ex. L.  The screenshot states that
26   he is a Board Certified Behavior Analyst (Certification Number 1-08-4738) and was originally
     certified on November 30, 2008.  Id.  The Court declines to take judicial notice of the information
27   contained in this screenshot because it does not establishes a fact that "can be accurately and
     readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.
28   201(b).

19

United States District Court
Northern District of California

Relator's other authenticated evidence also does not raise a triable issue to warrant denial of Defendants' motion for summary judgment.  In paragraph 29 of her revised declaration, Relator focuses on time Defendants billed for services she provided to a client by the name of Joshua Swift.  Relator states that she worked and billed far fewer hours for January and February 2013 for this client than the payments Defendants received for her work.  She attached Exhibits E1 and E2, which she states demonstrate that she worked with Joshua Swift for 22.5 hours in January 2013 and 0 hours in February 2013.  Consistent with Relator's declaration, Exhibits E1 and E2 show a total of 22.5 hours for January 2013 that were assigned to "Joshua" and neither exhibit shows hours worked for Joshua or any other client in February 2013.  Relator concludes that "ABC billed and received reimbursement from the Regional Center under Authorization #13180766 far [sic] more hours than worked on this client case."  However, to support this conclusion, Relator does not attach evidence that the NBRC (or anyone else) was overbilled for this client for Relator's work or that the NBRC (or anyone else) made any kind of payment to Defendants as a result of the alleged overbilling.

Relator also provided charts she prepared which she explains "demonstrate the pattern of pattern [sic] of overcharging client programs for services not rendered."  Cullen Decl., ¶ 33; Exs. H1-H2.  To credit these documents as evidence of false statements Defendants submitted, the Court would be required to take Relator's representations at face value that ABC wrongly billed or overbilled for services that Relator did not render on the dates represented by the billings, as reflected in these exhibits.  While a party's declaration should not be disregarded merely because it supports its position, Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 4997-98 (9th Cir. 2015), "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997).  Her declaration is thin and largely conclusory and is insufficient to support Relator's burden on her qui tam claims.

Relator's best evidence that Defendants engaged in fraudulent billing are the documents she provided at Exhibits G1-G5.  Cullen Decl., ¶ 34.  Relator points to several documents from July 2011 regarding Paul Knaus, a behavior specialist, showing that he may have made duplicate

billings for July 12 and July 27.  The documents appear to be parental verification forms.  The documents show that on July 12 Mr. Knaus obtained a parental signature verifying an appointment at 3:30-6:30, as well as verification for another appointment that same day at 4-6.  Exs. G1 & G2. Documents also show that for July 27 he obtained verifying signatures for three separate appointments from 7-9, in addition to appointments from 2-3:15 and 4-6:30.  Exs. G1, G2, G3, & G4.  These documents may raise a triable issue about whether Defendants submitted false statements.  However, it is far from clear whether these are in fact billing statements that Defendants submitted to government entities for payment.[6]

Furthermore, Relator has not submitted to the Court any documentary evidence that Defendants received payments from government entities as a result of the allegedly false claims Defendants made.  The only evidence Relator put forward to this effect are conclusory statements in her declaration that: (1) Defendants' fraudulent records "resulted in payment to ABC for services," Cullen Decl., ¶ 30; Cullen Rev. Decl., ¶ 28 ("This fraudulent billing resulted in payments to ABC.") & ¶ 29 ("In months of January 2013 and February 2013, I worked and billed far less hours for Joshua Swift than for what ABC received payment" and "ABC billed and received reimbursement from the Regional center under Authorization #13180766 far [sic] more hours than worked on this client case"); and (2) on information and belief, "Defendants' false

---

[6] At Exhibits D1-D2, Relator attached additional parental verification forms that she states were submitted to NBRC for payment of services.  Since Relator states that she obtained these documents directly from NBRC and has not otherwise authenticated the documents, the documents are inadmissible and the Court declines to consider them in reviewing this motion. However, even if the Court were to consider Exhibits D1-D2, they do not raise a triable issue of fact about whether Defendants submitted false statements.  Relator explains that the verification forms, both dated January 25, 2013, are fraudulent because she did not work for this client during January 2013 or February 2013.  However, Relator notes that the forms include work she performed for the client under authorization codes 13180768 and 13180766, which seems to indicate that Defendants were seeking payment for Relator's work with the client.

The face of the documents indicate that there could be a legitimate reason for the hours billed.  As they relate to the two authorization codes Relator references, the forms represent work performed from November 1, 2012 through January 31, 2013 and November 1, 2012 through March 31, 2013.  Therefore, Relator's explanation that she did not perform work for the client in January or February 2013 does not necessarily demonstrate the forms are inaccurate because they might represent work she performed in November and December 2012 and, for D2, March 2013. Relator provides no proof or even a conclusory statement about the hours she worked for the client during those months which might be able to substantiate her claim that the forms are fraudulent.

United States District Court
Northern District of California

claims to federal, state, and local government entities in the form of fraudulent billings were, as of the date of filing of my *qui tam* court Complaint, were in excess of $1.5 million . . . ," which Relator claimed on information and belief.  Cullen Decl., ¶ 16; Cullen Rev. Decl., ¶ 16.[7]  One element of an FCA or CFCA claim is that the government paid money to Defendants, but Relator has offered no specific evidence that payments were made.  Moreover, Relator has not put forward evidence that establishes a causal link between the allegedly false statements and the government's payments.  Relator's conclusory, unsupported statements, one of which was only made on information and belief, about the amount of money Defendants received and the cause of those payments fails to raise a triable issue of fact.  It is unfortunate for Relator that she apparently did not conduct sufficient discovery to obtain competent evidence of this key issue, which might well have proven her case.  However, on this record, Relator has failed to raise a triable issue of fact on her FCA and CFCA claims and the Court grants Defendants' motion for summary judgment as to those claims.

**B.    Counterclaimants' Motion for Summary Judgment on Counterclaims**

In addition to moving for summary judgment on Relator's claims, ABC and Palyo also moved for summary judgment on the counterclaims they raised against Relator, all of which are related to their allegations that Relator released her claims in the settlement of the wrongful termination and related claims she filed in state court.  Relator did not file a cross motion for summary judgment on the counterclaims, although she did assert several general challenges to Counterclaimants' ability to bring their claims against her.

**1.    Relator's Challenges to the Counterclaims**

Before addressing the merits of Counterclaimants' motion, the Court will resolve the

---

[7] The only evidence that purportedly shows that Defendants received payments is contained in Relator's Exhibits F1-F4, which the Court declines to consider because Relator failed to properly authenticate them.  Even if the Court did consider them, these exhibits, which Relator refers to as "POS, point of sale" documents that "represent[ ] the hourly payment of services" for two clients, do not actually represent payments made to Defendants.  A close review of the exhibits indicates that they are labeled "Authorization to Purchase Services" and seem to relate to authorization NBRC is giving to Defendant Association of Behavior Consultants, Inc., a vendor, for work performed between a certain period of time.  Thus, there is no clear connection between these authorization documents and overbilling and/or payment.

United States District Court
Northern District of California

1    various challenges that Relator asserts to the counterclaims in her opposition brief.  The Court is

2    encountering many of these arguments for the second or, in some cases, third time.

3              **a.**        **Subject-Matter Jurisdiction**

4          As she did in her earlier motion to dismiss, Relator argues that the Court does not have

5    subject-matter jurisdiction over the counterclaims because they are all based on state law.  The

6    Court rejected this argument in its September 1, 2017 order when it concluded that it has

7    supplemental jurisdiction under 28 U.S.C. § 1367 because the counterclaims arise "out of the same

8    case or controversy" as the federal qui tam claims.  Dkt. No. 84 at 9-10.  As law-of-the-case with

9    no changed circumstances identified in Relator's opposition, the Court declines to disturb this

10   earlier ruling.  Ariz. v. Cal., 460 U.S. 605, 618 (2014).

11         Relator also argues that this Court does not have subject-matter jurisdiction over the

12   counterclaims because they seek contractual remedies against the United States for more than

13   $10,000.  See 28 U.S.C. § 1491(a)(1) (The United States Court of Federal Claims shall have

14   jurisdiction to render judgment upon any claim against the United States founded . . . upon any

15   express or implied contract . . . ") (the "Tucker Act").  The counterclaims seek indemnification

16   from Relator specifically.  The Tucker Act does not vest exclusive jurisdiction for these claims

17   with the Court of Federal Claims.

18             **b.**        **Rule 12(b)(6) Motion for Failure to State a Claim**

19         Relator also raises arguments that the counterclaim fails to state a plausible claim for relief.

20   She argues that the counterclaim's allegations are only conclusory statements that conflict with the

21   terms of the Second Settlement Agreement.  Relator's Rule 12(b)(6) motion is untimely.  See Fed.

22   R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a

23   responsive pleading is allowed.").  While Rule 12(h)(2) permits the Court to convert a Rule

24   12(b)(6) motion into a Rule 12(c) motion for judgment on the pleadings, the Court has already

25   considered and rejected the same limited arguments Relator makes in support of her motion in its

26   August 1, 2017 order.  Therefore, the Court will not revisit the adequacy of the counterclaims'

27   allegations.

28             **c.**        **Bar on Counterclaims in Qui Tam Cases**

Relator argues that that the counterclaims must be dismissed because counterclaims are generally not permitted in qui tam cases. This bar on counterclaims in qui tam cases focuses on counterclaims for indemnification and contribution. The rationale for this prohibition is that the False Claims Act did not "intend[ ] to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff with 'unclean hands.'" Mortgages, Inc. v. United States District Court for the District of Nevada, 934 F.2d 209, 213 (9th Cir. 1991). Thus, qui tam defendants cannot bring counterclaims "for indemnification and contribution that are based on their liability under the [False Claims Act] or have the same effect as offsetting [False Claims Act] liability." United States v. Campbell, 2011 WL 43013, at *10 (D.N.J. Jan. 4, 2011). A qui tam defendant can bring counterclaims, however, for "independent damages." U.S. ex rel. Madden v. Gen. Dynamics Corp., 4 F.3d 827, 831 (9th Cir. 1993); see also Campbell, 2011 WL 43013, at *11 ("[c]ounterclaims or third party claims by an FCA defendant that are based on damages which are independent claims may be permitted, so long as those claims do not "have the effect of providing for indemnification or contribution") (internal quotations omitted).

In United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 505 F. Supp. 2d 20 (D.D.C. 2007), the court surveyed the cases on what constitutes a counterclaim for "independent damages" and provided the following summary:

> These cases demonstrate that there are two ways in which an FCA defendant's counterclaim may seek independent damages and thus be permissible. The use of the word independent has led to some confusion, and courts would be better served to describe the permissible claims as not dependent on the fact of FCA liability. In short form, claims by an FCA defendant have been properly permitted where the success of the FCA defendant's claim does not require a finding that the defendant is liable in the FCA case.
> . . .
> These cases come together to form a sensible rule. If a defendant's counterclaim is predicated on its own liability, then its claims against a relator typically will allege that the relator participated in the fraud, or caused the defendant some damage by the act of being a relator, that is, by disclosing the defendant's fraud. The first kind of action seeks contribution or indemnity, rights that are not provided by the FCA because they would deter relators, allow wrongdoers to shift their costs, and would disrupt the intended framework of incentives and punishments established by the FCA. The second kind of action has the same effect of providing contribution or indemnity, with the perverse twist that the relator is not even accused of contributing to the defendant's fraud. If such suits were allowed, they would punish

United States District Court
Northern District of California

1

2

3

> innocent relators, which would be a significant deterrent to
> whistleblowing and would imperil the government's ability to detect,
> punish, and deter fraud. The FCA contains several provisions seeking
> to protect relators from retaliation, and it would run counter to this
> policy if the Court were to allow retaliatory suits against truthful
> relators.

4   <u>Miller</u>, 505 F. Supp. 2d at 27-29.

5        In this case, the counterclaims do not depend on Counterclaimants' FCA liability. Under

6   Counterclaimants' theory, Relator would be responsible for indemnification regardless of whether

7   Defendants are found liable under the FCA as they allege that it is Relator's breach of the Second

8   Settlement Agreement that caused the damages and not the fact that she is a relator pursuing her

9   FCA claims. Accordingly, the <u>Mortgages</u> bar on qui tam counterclaims does not foreclose the

10   counterclaims in this case.

11               **d.        Retaliation for Relator's Protected Speech**

12        In a few short paragraphs that attempt to resurrect Relator's previously denied motions to

13   strike the counterclaims and seek Rule 11 sanctions, she argues that the counterclaims are

14   improper because they are made for the purpose of harassing her and attempting to impede the

15   protected speech she engaged in when she filed the Federal Complaint. The Court has already

16   ruled on the motion to strike twice and Rule 11 sanctions once and ruled against Relator each

17   time. Relator identifies no new arguments that justify changing that law-of-the-case.

18               **2.        Breach of Contract**

19        To succeed on a breach of contract claim, Counterclaimants must prove: (1) the contract,

20   (2) their performance of the contract or excuse for nonperformance, (3) Relator's breach, and (4)

21   resulting damage. <u>Richman v. Hartley</u>, 224 Cal. App. 4th 1182, 1186 (Cal. Ct. App. Mar. 20,

22   2014) (citing <u>Careau & Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1388 (Cal. Ct.

23   App. 1990)).

24        Counterclaimants have proffered the Second Settlement Agreement. It is signed by all

25   parties. Counterclaimants do not, however, demonstrate that they performed their obligations

26   under the contract. They provide no evidence that they paid Relator and her attorney the sums set

27   forth in Section 2.0 of the Second Settlement Agreement. Relator, however, does not claim that

28   Counterclaimants did not perform those obligations.

United States District Court
Northern District of California

1        Counterclaimants argue that it is undisputed that Relator breached the Second Settlement

2   Agreement by bringing this lawsuit against them, failing to indemnify Counterclaimants and hold

3   them harmless in this and other, unspecified actions, and failing to defend on behalf of

4   Counterclaimants.  Counterclaimants' motion assumes that the indemnity and hold harmless

5   language of Section 4.3 of the Second Settlement Agreement apply to this case and, therefore, that

6   Relator's undisputed failure to indemnify, defense, and hold harmless the Counterclaimants

7   amounts to a breach.  Counterclaimants provide evidence that they have incurred attorneys' fees in

8   excess of $109,000 to defend Relator's claims in this case.  Malone Decl., ¶ 12.

9        Contrary to Counterclaimants' assertion, Relator disputes that she has breached the Second

10  Settlement Agreement as alleged.  Relator contends that the plain terms of the Second Settlement

11  Agreement demonstrate that it does not apply to this lawsuit.  Section 1.1 of the Second

12  Settlement Agreement contains a full release of claims Relator had or would have in the future

13  against Counterclaimants that "in any way gr[ew] out of events . . . identified in [the State

14  Complaint]."  It also provides, however, that the release does "not extend to any claim or action,

15  known or unknown, by the United States or the State of California, or to any reward paid by the

16  United States or the State of California, pursuant to the Federal False Claims Act (31 U.S.C. §§

17  3729 et seq.), the California False Claims Act (Cal. Gov't Code §§ [sic] 12650), or any other

18  federal or state statute or regulation whereby a government entity claims entitlement to recover

19  funds and pays to anyone a reward for such recovery."  Ex. C, § 1.6.[8]  Relator argues that this

20  carve out covers her qui tam claims.

21        The parties dispute the meaning of this provision, so the Court must interpret it.  "The

22  primary object of all interpretation is to ascertain and carry out the intention of the parties.  All the

23  rules of interpretation must be considered and each given its proper weight, where necessary, in

24  

_____

25  [8] Relator filed a declaration from Jacklyn DeMar of the Taxpayers Against Fraud Education Fund
    that contains Ms. DeMar's view on whether a relator's release of retaliation claims, discrimination

26  claims, employment claims, or other personal claims bar the relator from bringing a qui tam action
    on behalf of the federal or state governments under the False Claims Act ("FCA").  In addition to

27  the issue that Ms. DeMar was never disclosed to Defendants as a fact or expert witnesses for
    Relator and Relator has not demonstrated how the nondisclosure is substantially justified or

28  harmless, Fed. R. Civ. P. 37(c), the Court also does not find Ms. DeMar's legal opinions regarding
    qui tam law to be helpful to determining the issues in this motion.

United States District Court
Northern District of California

order to arrive at the true effect of the instrument." City of Manhattan v. Sup. Ct., 13 Cal. 4th 232, 238 (1996) (quoting Burnett v. Piercy, 149 Cal. 178, 189 (1906)). "If contractual language is clear and explicit, it governs." Bank of the West v. Sup. Ct., 2 Cal. 4th 1254, 1264 (1992). "On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.'" Id. (quoting AIU Ins. Co. v. Sup. Ct., 51 Cal. 3d 807, 822 (1990)). "If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist." AIU Ins. Co., 51 Cal. 3d at 822 (citing Cal. Civ. Code § 1654). "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other" and "[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates. Cal. Civ. Code §§ 1641, 1647.

The plain language of this provision does not lend a straightforward answer to this dispute over whether the release applies to Relator's claims in this case, largely because the structure of the underlying qui tam statutes makes it somewhat difficult to disentangle a relator's interest in a qui tam case from the government's. The FCA provides that a person may bring a civil action for a violation "for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1). The CFCA is organized around the same type of relationship between the relator and the State of California. Cal. Gov't Code § 12652(b)(1). As discussed above in the res judicata section of this order and as is evident from these provisions, the relator and the government have a separate but intertwined interest in qui tam cases. See Ritchie, 558 F.3d at 1167 (recognizing that "the relator has an interest in some part of the civil action apart from the government" and that the Supreme Court has stated that "qui tam relators under the [False Claims Act] possess an interest akin to a 'partial assignment of the Government's damages claim'") (quoting Stevens, 529 U.S. at 773). Thus, the Second Settlement Agreement's reference to the claims of the United States or the State of California in § 1.6 does not unambiguously carve out the governments' qui tam claims only to the exclusion of Relator's stake in those claims.

United States District Court
Northern District of California

Moreover, while Section 1.6 of the Second Settlement Agreement clearly states that the Second Settlement Agreement does not apply to the United States' or State of California's claims, it is unclear why the parties would have included that carve out to a release that is only applicable to Relator.  Under certain circumstances, a release can extend to qui tam claims, but not in all circumstances.  Compare United States ex rel. Green v. Northrop Corp., 59 F.3d 953 (9th Cir. 1995) (declining to enforce general release entered into before the relator filed the qui tam complaint), with United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230 (9th Cir. 1997) (enforcing general release entered into before the relator filed the qui tam complaint but after the government received notice of the relator's allegations of fraud).  Here, the parties entered into the Second Settlement Agreement after Relator filed her qui tam complaint and after the United States and the State of California declined to intervene in this case.  Thus, under United States ex rel. Killingsworth v. Northrop Corp., 25 F.3d 715, 722-23 (9th Cir. 1994), the United States, at least, was not in a position to block Relator's settlement, if indeed it extended to her qui tam claims.

However, the fact that the United States could not have blocked the settlement at that point under Killingsworth but Relator and Counterclaimants still kept the general release carve out in § 1.6 raises the question of whether the carve out extends equally to Relator and the United States' qui tam claims.  Relator has submitted a declaration attesting to the fact that she never intended for the Second Settlement Agreement's general release to foreclose her qui tam claims – claims which, significantly, had already been filed.  Cullen Decl., ¶ 4.  The ambiguous language of § 1.6 coupled with Relator's declaration at the very least raises a triable issue on whether Relator breached the Second Settlement Agreement by filing this lawsuit in the first place.  Indeed, if Relator had cross-moved for summary judgment in her favor against the counterclaims, she might have prevailed.

There is also the related but separate question of whether Relator is liable for indemnification of Counterclaimants' defense costs in this litigation, which requires a determination of whether the indemnification clause applies to this case in the first place.  As with the application of § 1.6, this is fundamentally an issue of contract interpretation.

The disputed indemnification provision states:

> Plaintiff agrees to defend, indemnify, protect and hold the released parties harmless from any and all liens, rights of subrogation, indemnification claims, contribution claims, defense claims, losses, liability, actions, damages, causes of action, judgments, costs and expenses, including attorney's fees, whatsoever made by or sustained by or arising from any person, corporation, partnership, state or federal government, governmental agency, hospital, or any other medical provider, health care provider, disability or insurance benefits provider, workers compensation carrier, Medicare, Medicaid, Medi-Cal or any other entity arising in whole or in part out of the incident(s), or in any way connected to the allegations in this action.

Ex. C, § 4.3.

At first blush, this provision may appear to be a wide-ranging commitment by Relator to effectively compensate Counterclaimants for any losses that arise out of, even in part, or are connected "in any way" with the allegations in her State Complaint. Relator points out, however, that this interpretation does not fairly take into account the specific provision in Section 1.6 that she argues expressly exempted her state or federal qui tam claims from the otherwise general release contained in the agreement. Further, Relator states in her declaration that "[t]he settlement in my personal state court action applied only to my causes of action for whistleblower retaliation, wrongful termination, and unpaid wages owed after Defendants did a retaliatory reduction of my hourly pay rate, refused to pay wages for hours I worked, and then unlawfully terminated by caseload hours." Cullen Decl., ¶ 4.[9]

---

[9] Relator also argues that Section 4.3's "boilerplate medical liens indemnity language" should not be construed so broadly in light of the overall intent of the Second Settlement Agreement and the fact that her State Complaint sought recovery for personal injuries. While she may well be correct, she did not properly disclose the witness for her belated evidence on this point: a declaration from her counsel Daniel Bartley that this provision is and was intended to be a personal injury medical liens indemnification clause. He declares that he has handled 500 cases involving personal injury, which he defines as physical or emotional injury. Bartley Decl., ¶ 12. He states that through this experience he has become familiar with settlement agreements that are used to resolve personal injury cases. Id. He further states that the type of medical lien indemnification clause that is common in personal injury cases was included in the Second Settlement Agreement. Id. He further states that there was "never, ever, any intention and never, ever, any discussion or any meeting of the minds, that such indemnification clause constituted a promise to indemnify [Counterclaimants] for damages they might suffer from their billing fraud misconduct." Id. (emphasis in original). Counterclaimants object to portions of Mr. Bartley's declaration, including his statements about the indemnification language, because Relator did not disclose him as a fact or expert witness. Relator has not demonstrated how this nondisclosure is substantially justified or harmless, Fed. R. Civ. P. 37(c), so the Court must disregard Mr. Bartley's

1      Moreover, the term "any other medical provider" can reasonably be read as modifying the

2 earlier, more general categories of possible claimants so that "any person, corporation, partnership,

3 state or federal government, governmental agency, hospital" is limited to instances in which the

4 claimants are acting as medical providers, particularly in light of the listing of "hospital" with

5 other entities who could also be medical providers. Considered in context, as it must be, this

6 language helps support Relator's proposed interpretation.

7      Accordingly, the Court denies summary judgment on the interpretation of these provisions

8 and the breach of contract claim. Relator has raised at a minimum a real dispute over how to

9 properly interpret these provisions of the Second Settlement Agreement, if not made the stronger

10 argument. However, Relator did not move for summary judgment on her claim, so the Court can

11 only deny Counterclaimants' motion.

12                    **3.      Express and Implied Indemnity Claims**

13      Relatedly, Counterclaimants also seek summary judgment on their express and implied

14 indemnity claims. California Civil Code Section 2772 defines "indemnity" as "a contract by

15 which one engages to save another from a legal consequence of the conduct of one of the parties,

16 or some other person." It has been defined by the California courts as "the obligation resting on

17 one party to make good a loss or damage another party has incurred." Rossmoor Sanitation, Inc.

18 v. Pylon, Inc., 13 Cal. 3d 622, 628 (1975). Although indemnity generally relates to third parties,

19 parties may also contract for direct liability. Zalkind v. Ceradyne, Inc., 194 Cal. App. 4th 1010,

20 1024 (Cal. Ct. App. 2011) (citing Dream Theater, Inc. v. Dream Theater, 124 Cal. App. 4th 547,

21 555 (Cal. Ct. App. 2004)). "[T]he question of whether an indemnity agreement covers a given

22 case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in

23 the agreement that should control." Rossmoor, 13 Cal. 3d at 633. Indemnity may be either

24 express in contractual language or implied by "equitable considerations brought into play either by

25 contractual language not specifically dealing with indemnification or by the equities of the

26 particular case." E.L. White, Inc. v. City of Huntington Beach, 21 Cal. 3d 497.

27

28
_____
declaration evidence, although doing so does not alter the outcome.

United States District Court
Northern District of California

Section 4.3 of the Second Settlement Agreement provides that Realtor must indemnify, defend, and hold harmless Counterclaimants from any " . . . claims losses, liability, actions, damages, causes of action, judgments, costs and expenses, including attorney's fees," that  "aris[e] in whole or in part out of the incident(s), or in any way connected to the allegations in this action." Ex. C, § 4.3.  Similar to Counterclaimants' arguments in support of their breach of contract claims, they contend that it is undisputed that Relator has not indemnified Counterclaimants in this case and, thus, it should prevail on its indemnification claims.  Counterclaimants do not explain how the facts of this case satisfy an implied indemnification claim.

The breach of contract and indemnification claims rise and fall together in this case because they both come down to the proper way to interpret the indemnification provision.  Accordingly, for the reasons discussed above, the Court denies Counterclaimants' motion for summary judgment on the indemnification claims.

### 4.    Declaratory Relief

California law provides that in a case involving a written contract declaratory relief is available "in cases of actual controversy relating to the legal rights and duties of the respective parties."  Cal. Civ. Proc. Code § 1060.  The purpose of declaratory relief is to "liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation . . . "  Meyer v. Spring Spectrum L.P., 45 Cal. 4th 634, 647 (2009).  In light of Relator's contrary interpretation of Section 4.3's indemnification provision, Counterclaimants seek a declaratory order from the Court that they are entitled to indemnity from Relator "for claims covering the same subject matter of the disputes previously adjudicated in the Sonoma County lawsuit."  Mot. at 10.  As with the breach of contract and indemnification claims, it is premature to grant Counterclaimants' motion for summary judgment on their request for declaratory relief because Relator has raised a triable issue on the scope of the indemnification provision in the Second Settlement Agreement.

### 5.    Res Judicata

As in their motion for summary judgment on Relator's claims, Counterclaimants ask the Court to make a judicial determination that Relator's claims are barred by res judicata.  For the

31

same reasons discussed above, the Court denies Counterclaimants motion for summary judgment on this issue.

### 6. First-to-File Rule

Counterclaimants' last argument is that the first-to-file rule precludes Relator's FCA claims.  As discussed above, Relator satisfies the first-to-file rule and the Court denies the motion for summary judgment.

## V. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' motion for summary judgment on Relator's claims and DENIES Counterclaimants' motion for summary judgment on the counterclaims.

**IT IS SO ORDERED.**

Dated: May 9, 2019

ELIZABETH D. LAPORTE
United States Magistrate Judge

United States District Court
Northern District of California

32